**CLERK'S OFFICE**
A TRUE COPY
**Dec 04, 2025**
**s/ MMK**
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Tracking of<br>*(Identify the person to be tracked or describe<br>the object or property to be used for tracking)*<br>A gray 2007 Honda Odyssey van bearing Wisconsin<br>Registration BCD-5755, VIN 5FNRL38787B408310<br>("Subject Vehicle") | ) ) ) ) ) ) )  Case No.  25   MJ   200<br><br>Matter No. 2025R353 |

**APPLICATION FOR A TRACKING WARRANT**

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of ___21___ U.S.C. § _841(a)(1), 843(b), & 846_ . Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.

☐ The person, property, or object is not now located in this district, but will be at the time of execution.

☐ The activity in this district relates to domestic or international terrorism.

☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;

☑ property designed for use, intended for use, or used in committing a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ a person to be arrested or a person who is unlawfully restrained.

☑ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:
A gray 2007 Honda Odyssey van bearing Wisconsin Registration BCD-5755, VIN 5FNRL38787B408310 ("Subject Vehicle") located at 738 S. 23rd Street, Milwaukee, Wisconsin.

☑ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JOSEPH L ESQUEDA  Digitally signed by JOSEPH L ESQUEDA Date: 2025.12.02 12:57:44 -06'00'

*Applicant's signature*

Joseph Esqueda, HSI TFO

*Applicant's printed name and title*

Attested to by the applicant in accordance with the

requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    12/04/2025

*Judge's signature*

City and state:    Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Joseph ESQUEDA, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to install and monitor an electronic tracking device to determine the location of a vehicle more particularly described as a gray 2007 Honda Odyssey van having WI license plate BCD-5755, VIN 5FNRL38787B408310 (hereinafter "**subject vehicle**").

2. I am Police Officer with the Milwaukee Police Department (WI) and a Federally Deputized Task Force Officer with Homeland Security Investigations ("HSI") assigned to the Homeland Security Task Force ("HSTF"). I am also assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Interdiction Initiative as a drug detection K9 handler and partnered with K9 "GHOST." I have been employed as a full-time law enforcement officer for over twenty (20) years.

3. As Police Officer and Task Force Officer, I have participated in the investigation of gang and narcotics related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. As an investigator, I have interviewed many individuals involved in drug trafficking and gang activity, and have obtained information from them about the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the drug traffickers, gang members, and abusers of controlled substances. I have participated in all aspects of drug and gang investigations, including physical surveillance, execution of search warrants, court-ordered wiretaps, analysis of phone and financial

records, and the arrests of drug traffickers. I have also been the affiant and participated in the preparation and execution of drug and gang-related search warrants. Additionally, I have spoken with other experienced drug investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers and gang members to manufacture, smuggle, safeguard, and distribute narcotics and firearms, and to collect and launder trafficking-derived proceeds. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of cellular devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their locations.

4. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps.

5. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

6. As part of my duties as a HSI TFO, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the federal controlled substance

2

laws, including, but not limited to Title 21, United States Code, Sections 841, 843, 846, and federal firearms offenses, including violations of Title 18, United States Code, Sections 922(g), 924(a), and 924(c). During the course of my experience, I have and continue to be involved in investigations of criminal offenses and have assisted with search warrants for items related to gang investigations, organized crime, violent crime, firearms offenses, drug trafficking, thefts, and counterfeit crimes, including cellular telephones and other electronic telecommunication devices.

7. Based on my training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I am familiar with the methods used by drug traffickers and drug organizations to manufacture, smuggle, safeguard, and distribute controlled substances, and to collect and launder trafficking-derived proceeds. Further, I am familiar with computers and cellular telephones, and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions. Based on my training and experience, I know that drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, and video and audio clips. I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices. I also know that cellular telephones can provide location information relevant to the offenses of investigation.

8. The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to

3

show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

10.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (use of a communication facility in furtherance of drug trafficking)  have been committed, are being committed, and/or will be committed by Miguel GONZALEZ (DOB XX/XX/1995).  There is also probable cause to believe that the location of the **subject vehicle** will constitute evidence of that criminal violation.

11.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

12.     On Tuesday, September 30, 2025, Wisconsin State Patrol Trooper Gareth Sedgebeer-Williams and Drug Enforcement Administration (DEA) Task Force Officer (TFO) Robert Gregory responded to a private parcel carrier for random parcel screening. Case agents located two different parcels that were addressed to Thomas Baker of 3021 West Auer Avenue, Milwaukee, Wisconsin. The parcels were sent from Glenair INC of 1211 Air Way, Glendale,

4

California, 91201. Case agents were unable to find a "Thomas Baker" residing at 3021 West Auer Avenue and believed it to be a fake alias.

13. Trooper Sedgebeer-Williams deployed his trained controlled substance detection K9 (Smoky) on the parcels and Smoky gave a final indication to the odor of controlled substances coming from the parcels. Trooper Sedgebeer-Williams composed a State of Wisconsin search warrant to search the contents of the parcels.

14. Upon the warrants being granted, case agents located approximately 20 pounds of crystal methamphetamine in each parcel (40 pounds of crystal methamphetamine total).

15. Also on September 30, 2025, law enforcement executed a controlled delivery of the seized parcels. The crystal methamphetamine was removed from the parcels and they were filled with "sham," (a substance that is not a controlled substance). An undercover Milwaukee Police Officer delivered both parcels to 3021 West Auer Avenue and placed them on the ground in front of the door. Officers observed a male, later identified as Brandin S. FOUNTAINE (DOB XX/XX/1986), walk to 3021 West Auer Avenue. FOUNTAINE observed both parcels and he ran back to 3002 West Burleigh Street. FOUNTAINE then drove out of 3002 West Burleigh Street in a black pick up truck. FOUNTAINE drove directly to 3021 West Auer Avenue and placed both parcels in the bed of his pick up truck. After FOUNTAINE obtained the parcels, law enforcement conducted a traffic stop of the vehicle and FOUNTAINE was detained.

16. A *Mirandized* Interview was conducted of FOUNTAINE. FOUNTAINE stated that he rents a space within 3021 West Burleigh Street to fix automobiles, but also conducts maintenance work at 3002 West Burleigh Street and 3021 West Auer Avenue. FOUNTAINE stated he was walking his dog when he observed the two parcels at 3021 West Auer Avenue. FOUNTAINE later obtained the parcels and was going to bring them back to 3002 West Burleigh

5

Street and put them in a common area where all delivered parcels go to. FOUNTAINE denied knowing what was inside of the parcels. FOUNTAINE gave officers consent to download and inspect the contents of his cell phone. FOUNTAINE was later released.

17. Case agents reviewed the data on FOUNTAINE's cell phone. On September 30, 2025, at approximately 10:39AM, FOUNTAINE was texting with "Babezzz" (608-421-4960). FOUNTAINE stated, "The package still isn't here. We are down the block waiting for it me and the Mexican.". With this message being on the same day as the controlled delivery, case agents believe that FOUNTAINE lied to law enforcement and was in fact involved in obtaining the parcels that previously contained crystal methamphetamine.

18. Case agents also found a text message string with (414) 807-0753 (hereinafter "Target Cell Phone 1") within FOUNTAINE's cell phone. As it will be explained later in this affidavit, case agents found Target Cell Phone 1 to be utilized by Miguel A. GOZNALEZ (DOB XX/XX/1995). The contact name was "Twitch" in FOUNTAINE's cell phone. Case agents conducted a check of CashApp for Target Cell Phone 1 and found the CashApp account to be: "Miguel Gonzalez $74sendittt". On June 19, 2025, at approximately 11:46PM, Target Cell Phone 1 (believed to be GONZALEZ) texted FOUNTAINE, "Tell primo I need him active by 8am" and "Get a little rest" and "Its important". Case agents subpoenaed records from the private parcel company from which the two methamphetamine-laden parcels came. Case agents requested a comprehensive list of all parcels that were sent by Glen Air INC from January 1, 2025 to October 7, 2025. Case agents searched for all parcels that were delivered on June 20, 2025. Case agents found that a parcel was delivered to 3100 West Concordia Avenue, Milwaukee, Wisconsin, 53216. 3100 West Concordia Avenue is one block north and one block west of 3021 West Auer Avenue.

6

19. Based on the text message sent by Target Cell Phone 1 (believed to be GONZALEZ) to FOUNTAINE, along with the delivery of the parcel, case agents believe that GONZALEZ was telling FOUNTAINE that a parcel was being delivered and that he (FOUNTAINE) and "Primo" would be needed to pick up the parcel.

**Confidential Source Information**

**Confidential Source 1**

20. In October of 2025, case agents were made aware of a confidential source (CS 1) that had information related to this investigation. On Tuesday, October 30, 2025, case agents met with CS 1. CS 1 stated that in July or August of 2023, CS 1 met Anthony M. MITCHEM (white male 01/23/1980) while incarcerated. Case agents showed CS 1 a photograph of MITCHEM and CS 1 positively identified MITCHEM. While in custody, CS 1 and MITCHEM spoke about crystal methamphetamine trafficking. In January of 2024, after being released from custody, MITCHEM called CS 1 about CS 1 obtaining crystal methamphetamine from MITCHEM. That same day, CS 1 drove to Milwaukee and met with MITCHEM at a gas station. CS 1 bought 1 pound of crystal methamphetamine from MITCHEM for $3,000. CS 1 estimated that he purchased anywhere between 3 to 5 pounds of crystal methamphetamine from MITCHEM.

21. While CS 1 was dealing with MITCHEM, MITCHEM introduced CS 1 to MITCHEM's uncle. CS 1 did not know this individual's real name. From case agents' knowledge of this investigation, case agents believed the uncle to be a subject herein referred to as Confidential Source 2 (CS 2). Case agents showed CS 1 a photograph of CS 2 and CS 1 identified CS 2 as CS 1's crystal methamphetamine supplier.

22. According to CS 1: In May or June of 2024, CS 1 was released from a drug treatment program and CS 1 received a phone call from CS 2. They spoke about the sales of crystal

7

methamphetamine and CS 1 agreed to begin buying crystal methamphetamine from CS 2. Shortly thereafter, CS 1 would travel to Milwaukee once a week to purchase crystal methamphetamine from CS 2.

23. According to CS 1: If CS 1 arrived in Milwaukee during the day, CS 1 would meet CS 2 at a factory building CS 2 managed. From case agents' knowledge of this investigation, case agents knew that CS 2 was associated with 3002 West Burleigh Street. Case agents showed CS 1 a Google Maps photograph of 3002 West Burleigh Street and CS 1 positively identified this as the building where CS 1 would meet CS 2 to purchase the crystal methamphetamine. 3002 West Burleigh Street is the building in which Brandin FOUNTAINE attempted to bring two parcels that previously contained crystal methamphetamine before being detained by law enforcement.

24. CS 1 stated that CS 1 would arrive at the location and CS 2 would open the gate for CS 1 to drive in. CS 1 would drive to a parked camper or RV and stay in the vehicle. CS 2 would go inside of the camper or RV to obtain the crystal methamphetamine. The transaction would occur and CS 1 would immediately leave.

25. Through their criminal relationship, CS 1 estimated that CS 1 purchased one pound of crystal methamphetamine from CS 2 on approximately 20 different occasions. CS 1 purchased five pound quantities on approximately 4 difference occasions. In total, CS 1 stated that CS 1 purchased 40 to 50 pounds of crystal methamphetamine from CS 2. CS 1 further stated that the crystal methamphetamine that CS 1 was arrested with was purchased from CS 2.

26. Beginning in October of 2025, CS 1, made statements against CS 1's penal interest. CS 1 has the following criminal convictions: burglary, operating a vehicle without owner's consent, attempt disarming of a police officer, felony bail jumping, possession with the intent to deliver marijuana, felon in possession of a firearm, possession of controlled substances, and

8

possession with the intent to deliver amphetamine. CS 1 is currently in custody after being charged with controlled substance trafficking in the Eastern District of Wisconsin. CS 1 has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 1's information has been corroborated by seizures of physical evidence. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

**Confidential Source 2**

27.     Case agents found that CS 2 was currently in custody. Case agents met with CS 2 who provided case agents with information related to this investigation. CS 2 stated that in March or April of 2025, CS 2 rented out a portion of a warehouse building located on North 30th Street and West Burleigh Street. TFO Gregory showed CS 2 a photograph of 3002 West Burleigh Street and CS 2 positively identified this as the building in which CS 2 rented a space. 3002 West Burleigh Street is the warehouse building in which FOUNTAINE was bringing the seized crystal methamphetamine parcels to before he was stopped by law enforcement on September 30, 2025. Case agents showed CS 2 a photograph of FOUNTAINE and CS 2 positively identified FOUNTAINE. CS 2 stated that the building is owned by Frank MITCHEM. CS 2 has known Frank MITCHEM CS 2's whole life and considers Frank MITCHEM as a relation. CS 2's space inside the building was the rear West corner and CS 2 paid Frank Mitchem $1,500 per month. CS 2 was able to give officers the name of other individuals that rented space within the building: "Cuba", individuals from Venezuela, "Brett", "Marco", and "Miguel".

28.	CS 2 also knew "Miguel" as "Bobby." CS 2 stated that "Miguel" was CS 2's crystal methamphetamine supplier. TFO Gregory showed CS 2 a Wisconsin Department of Transportation (WI DOT) photograph of GONZALEZ and CS 2 positively identified GONZALEZ as CS 2's crystal methamphetamine supplier. CS 2 stated that GONZALEZ's personal phone number started with "807." Case agents knows that GONZALEZ's phone number is 414-807-0753 **(Target Cell Phone 1)**. According to CS 2, GONZALEZ would use other phones that he utilized for controlled substance trafficking and would change phones/phone numbers every month. CS 2 stated that GONZALEZ lives with his child's mother near the area of South 23rd Street and West National Avenue. Case agents conducted a WI DOT check of GONZALEZ and found his registered address to be 738 South 23rd Street. This registered address corroborates CS 2's information. Through law enforcement databases, case agents found that GONZALEZ is romantically involved with Anatalia L. RODRIGUEZ (DOB XX/XX/1989). RODRIGUEZ's WI DOT registered address is also 738 South 23rd Street.

29.	CS 2 had known GONZALEZ for approximately four years before GONZALEZ had moved into 3002 West Burleigh Street. Shortly after moving into the warehouse, GONZALEZ approached CS 2 and began to ask about CS 2's open federal case. CS 2 assured GONZALEZ that CS 2 was not cooperating with law enforcement and GONZALEZ inquired with CS 2 if CS 2 knew of individuals that wished to purchase crystal methamphetamine. CS 2 in fact did have associates of Asian descent that wished to purchase crystal methamphetamine. CS 2 knew these individuals as "Asian Boy" and "Fire Boy." CS 2 believed that "Asian Boy" and "Fire Boy" were crystal methamphetamine users and street level traffickers that sold the crystal methamphetamine in a "tent city" near North 32nd Street and West Cherry Street.

10

30. CS 2 then began to fill orders for these individuals through GONZALEZ. For about a month, CS 2 would obtain an ounce of crystal methamphetamine from GONZALEZ and then sell the crystal methamphetamine to the buyers. CS 2 would sell the crystal methamphetamine for $200 and would make $100 of the transaction. Every time that CS 2 would order the crystal methamphetamine from GONZALEZ, GONZALEZ would leave 3002 West Burleigh Street and come back with the crystal methamphetamine shortly thereafter. This made CS 2 believe that GONZALEZ has a stash location nearby. CS 2 further stated that sometimes FOUNTAINE would go and get the crystal methamphetamine and bring it to 3002 West Burleigh Street.

31. The transactions amounts increased from ounces, to multiple ounces, to then even half pounds and full pounds of crystal methamphetamine. CS 2 would sell a half pound of crystal methamphetamine for $1,250 to $1,300 and a full pound for $2,000 to $2,500. CS 2 estimated that CS 2 sold "Asian Boy" and "Fire Boy" 10 to 20 pounds of crystal methamphetamine. All of this crystal methamphetamine was obtained by CS 2 from GONZALEZ.

32. CS 2 was arrested operating a vehicle while intoxicated prior to the seizure of the two methamphetamine-laden parcels discussed above. CS 2 stated that last crystal methamphetamine transaction CS 2 made with "Asian Boy" and "Fire Boy" was one week before CS 2 was arrested and CS 2 sold them one pound of crystal methamphetamine that CS 2 obtained from GONZALEZ.

33. CS 2 stated that CS 2's nephew, Anthony MITCHEM, introduced CS 2 to another crystal methamphetamine trafficker, CS 1. Case agents showed CS 2 a WI DOT photograph of Anthony MITCHEM and CS 2 positively identified Anthony MITCHEM as CS 2's nephew. Through case agents' knowledge of this investigation, case agents know this to be CS 1. Case agents showed CS 2 a WI DOT photograph of CS 1 and CS 2 positively identified the individual.

11

CS 2 knew that CS 1 was from the Fox Valley area. CS 1 would travel to the Milwaukee area and purchase crystal methamphetamine from CS 2. CS 2 would meet CS 1 in a number of different areas: Potawatomi, 3002 West Burleigh Street, or other areas in Milwaukee. CS 2 further stated that CS 2 knew CS 1 was arrested by police while in possession of crystal methamphetamine. CS 2 stated that days prior to CS 1 being arrested, CS 2 sold CS 1 two pounds of crystal methamphetamine that CS 2 received from GONZALEZ. CS 2 estimated that CS 2 sold crystal methamphetamine to CS 1 on 10 to 15 occasions. All of the crystal methamphetamine sold by CS 2 to CS 1 was supplied by GONZALEZ.

34. CS 2 was then asked how GONZALEZ was obtaining the crystal methamphetamine. CS 2 had first-hand knowledge that GONZALEZ would receive the crystal methamphetamine through the mail from California. CS 2 did not know the company utilized to send the parcels. GONZALEZ would use different addresses to have the parcels sent to. GONZALEZ would commonly have more than one parcel sent at a time. The total sum of the parcels ranged from 20 to 50 pounds. CS 2 estimated that GONZALEZ would receive a shipment once a month or every six weeks. CS 2 stated that if there were two parcels coming to Milwaukee, GONZALEZ would go to one location while FOUNTAINE would go to the other.

35. CS 2 recalled a parcel delivery in the summertime of 2025. CS 2 was present for the delivery and believed it to be in the area of North 47th Street or North 49th Street by West Hampton Avenue. CS 2 remembers the house was by a McDonalds by West Hampton Avenue. Case agents reviewed a map of the area and found a McDonalds on the South West corner of North 49th Street and West Hampton Avenue. CS 2 knows that GONZALEZ has a family member in the area and GONZALEZ picked an abandoned house in the area to have the parcel sent to. GONZALEZ obtained the package after it was delivered and opened it in front of CS 2. CS 2

12

stated that the parcel was filled with packing peanuts and there were numerous saran wrapped bundles that each contained one pound of crystal methamphetamine. CS 2 estimated there was 10 pounds of crystal methamphetamine in the parcel. This packaging style is the same in which case agents encountered in the two seized parcels from September 30, 2025.

36. CS 2 stated that GONZALEZ would take frequent trips to California in order to pay his crystal methamphetamine supplier. CS 2 further stated that the supplier would commonly come to Milwaukee and GONZALEZ would have to entertain the individual. When the supplier would come to Milwaukee, GONZALEZ would be frantically collecting money from customers in order to pay the supplier.

37. Investigators conducted a review of Wisconsin Department of Corrections recorded jail call system, ICSOULTIONS, for Target Cell Phone 1. Since CS 2 has been in custody, CS 2 has been in contact with GONZALEZ on Target Cell Phone 1 on seven different occasions between 10/17/2025 and 11/11/2025.

38. Beginning in 2024, CS 2 made statements against CS 2's penal interest's concerning CS 2's federal drug indictment. CS 2 was released from custody and not revoked on CS 2's state supervision despite the federal charges to allow CS 2 to cooperate with law enforcement. CS 2 provided cooperation to federal agents until CS 2 was arrested for operating under the influence and held in custody. CS 2's cooperation included at least one controlled buy of controlled substances and CS 2 providing information concerning drug traffickers in the Milwaukee area. CS 2's information regarding these drug traffickers was credible and, in some cases, independently corroborated by law enforcement. Further, CS 2 provided location information on a wanted subject that led to that person's arrest. However, during that time, and against CS 2's cooperation agreement, CS 2 became involved in selling methamphetamine to CS

13

1 and others as recounted above. When confronted with this by case agents following CS 2's arrest, CS 2 admitted to CS 2's conduct and made further statements against CS 2's penal interest concerning CS 2's trafficking of methamphetamine while CS 2 was actively cooperating with law enforcement. Case agents believe that when CS 2 was confronted with case agents' knowledge about CS 2's methamphetamine trafficking CS 2 provided a truthful statement regarding CS 2's involvement in methamphetamine sales. It is possible, however, that CS 2 was involved in *other* unlawful or deceptive conduct while CS 2 was cooperating with law enforcement, and that law enforcement has not yet learned of this additional unlawful or deceptive conduct. On balance, because case agents have corroborated a significant amount of information provided by CS 2 concerning GONZALEZ and CS 2's connection to GONZALEZ, they believe CS 2's information concerning GONZALEZ is accurate and reliable. CS 2 has the following criminal convictions: recklessly endangering safety, burglary, felony bail jumping, escape, possession with the intent to deliver cocaine, and felon in possession of a firearm. CS 2 is currently in custody after being charged with controlled substance trafficking in the Eastern District of Wisconsin and state charges of OWI (1st w/ Passenger < 16 Yrs Old), Operating w/ PAC-Passenger < 16 Yrs, PAC>=0.08, <0.15 (1st), and Neglecting a Child (No Harm and Child < 6 Yrs or Disability). CS 2 has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by CS 2 concerning the investigation into RODRIGUEZ has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 2 is credible and CS 2's information reliable.

14

39.     In November of 2025, your affiant reviewed subscriber information for Target Cell Phone 1. Subscriber results from T-Mobile listed an unknown subscriber.

40.     Case agents went to the area where CS 2 reported the "tent city" and located several caravans/RVs parked in an area consistent with CS 2's information.

41.     Separately, the Drug Enforcement Administration (DEA) conducted a controlled buy operation using CS 3 in the same general area near 32nd Street in Milwaukee, Wisconsin.  In sum, within the last 10 days, DEA conducted a controlled buy of crystal methamphetamine from a male of Asian descent (Kue LEE). It is unknown whether LEE is  the person known to CS 2 as "Asian Boy" or "Fire Boy."

42.     On November 19, 2025, Waukesha County Drug Task Force (WCDTF) confidential source (herein CS 3) purchased approximately 472.9 gross grams of suspected methamphetamine, approximately 91.2 gross grams of suspected Fentanyl, and approximately 55.4 gross grams of suspected fentanyl from Kue LEE. As detailed below, I believe that the methamphetamine provided to CS 3 by LEE was supplied to LEE by GONZALEZ.

43.     For several reasons, case agents believe CS 3's information is reliable and that CS 3 is credible. Substantial parts of CS 3's information has been independently corroborated and verified by law enforcement. CS 3 has made direct observations, which were further corroborated and verified by law enforcement. CS 3's information has been consistent with information obtained from telephone toll records, social media records, public databases, and surveillance. CS 3 has also provided information to the Brown County Drug Task Force and the Marinette County Sheriff's Department, which has been verified by law enforcement. CS 3 has prior convictions for theft, possession of controlled substances, battery, and manufacture or deliver controlled substances. CS 3 is cooperating for consideration on open cases for drug-related offenses. Within

15

the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 3 is credible and CS 3's information reliable.

44. On November 19, 2025, TFO Kopatich and SA Kazamias met with CS 3. TFO Kopatich searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results. After the search, TFO Kopatich provided CS 3 with a quantity of Officially Advanced Funds (OAF). Additionally, CS 3 was provided with a live feed audio/video recording device and recording a device was placed in CS 3's vehicle. CS 3 was contacted by LEE and informed that LEE was staying at the Holiday Inn Express. CS 3 was kept under constant surveillance and drove towards the Holiday Inn Express, located at 525 N. Jefferson Street, Milwaukee, Wisconsin. CS 3 parked CS 3's near the Holiday Inn Express and subsequently entered room number 202. LEE and an unidentified female (hereafter referred to as UFM1) were in room 202. While in room 202, CS 3 provided LEE with the buy money for the purchase of the controlled substances as witnessed by TFO Kopatich via live video feed.

45. CS 3, LEE, and UFM1 exited the hotel room, and subsequently entered CS 3's vehicle and departed the area. It should be noted that CS 3 was under constant surveillance as CS 3, LEE, and UFM1 travelled to a residence located at 320 N. 32nd Street, Milwaukee, Wisconsin. CS 3, LEE, and UFM1, parked behind 320 N. 32nd Street, and exited the vehicle. Subsequently, they proceeded to enter a gated area where there was a shed and camper. CS 3 entered the camper. Shortly thereafter, LEE went into a shed near the camper. At one point, CS 3 exited the camper in order to open the gate for three middle-aged Asian males who met with LEE in the shed while CS 3 went back into the camper. A short time later, the three Asian males left after which LEE provided the suspected purple fentanyl to CS 3. During a post operational debrief with CS 3, CS 3 stated that the three Asian males were the ones who delivered the purple fentanyl to LEE. CS 3

16

further reported that CS 3 has seen the same males deliver the fentanyl to LEE in the past prior to LEE providing the fentanyl to CS 3.While inside the camper, CS 3 waited for the delivery of controlled substances with multiple unidentified individuals, believed to have been customers.

46.     TFO Loftus observed a gray Honda Odyssey bearing WI Registration BCD5755 (**subject vehicle**) arrive at 21st and St. Paul in Milwaukee, Wisconsin. Shortly thereafter, TFO Loftus observed LEE enter the Odyssey (**subject vehicle**) and depart the area. A Wisconsin Department of Transportation check of the Odyssey (**subject vehicle**) lists the vehicle to a Rehab Better Home LLC, with a listed address of 155 E. Johnson Street, Fond Du Lac, WI, 54935. Shortly after meeting with the occupant(s) in the Odyssey (**subject vehicle**), LEE returned to the camper. CS 3 exited the camper, entered CS 3's vehicle, and departed the area. CS 3 was kept under constant surveillance as CS 3 departed the residence and met with case agents at a predetermined meet location. While at the predetermined meet location, TFO Kopatich retrieved four quantities of suspected controlled substances from CS 3.  TFO Kopatich searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results.

47.     Case agents conducted a post-operational debrief with CS 3. During the debrief, CS 3 stated that LEE met with the methamphetamine source of supply in a van (which, in context, I believe to be the **subject vehicle**) in the area of N. 31st Street and St. Paul Avenue, the same location where TFO Loftus observed LEE entering the Honda Odyssey (**subject vehicle**). CS 3 stated that CS 3 believed the methamphetamine source of supply to be a Hispanic male. CS 3 stated that LEE returned to the camper with a small box containing two individually wrapped pounds of methamphetamine. According to CS 3, LEE removed one of the pounds to be divided amongst the waiting customers while LEE gave CS 3 the box containing the other pound. CS 3 also stated that LEE had provided CS 3 with the purple fentanyl as well as a small bag of white fentanyl. The CS

17

also stated that an unidentified subject gave CS 3 a quantity of suspected marijuana. CS 3 stated that prior to leaving, LEE told CS 3 that CS 3 owed LEE $1,400 to be paid at a later time.

48. Case agents reviewed Wisconsin Department of Financial Institutions (WIDFI) records for "Rehab Better Home LLC" and learned that the Registered Agent is Miguel A. GONZALEZ and the principal office is listed as 738 S. 23rd Street, Milwaukee, Wisconsin 53204. As detailed above, case agents conducted a WI DOT check of GONZALEZ and found his registered address to be 738 South 23rd Street. Based on my training and experience, the information provided by CS 1, CS 2, and CS 3, the observations made during the controlled buy with CS 3, and the WIDOT and WIDFI records, I believe that GONZALEZ (or someone operating on GONZALEZ's behalf) delivered two pounds of methamphetamine to LEE inside the Odyssey (**subject vehicle**).

49. On November 18, 2025, TFO Gregory conducted surveillance at the location of 738 S. 23rd Street, a residence known to be associated with GONZALEZ. During that surveillance, TFO Gregory observed the Odyssey (**subject vehicle**) parked on the grass in the rear of the location. Case agents conducted a search of WI DOT records related to Wisconsin registration plate BCD-5755 and identified the VIN for the Odyssey as 5FNRL38787B408310 and that it is a 2007.

50. On December 2, 2025, TFO Gregory, Trooper Sedgbeer-Williams, TFO Esqueda, and other law enforcement officers were conducting surveillance at 738 S. 23rd Street, a residence associated with GONZALEZ. During that surveillance, case agents observed the Odyssey (**subject vehicle**) parked on the grass in the rear of the location. Furthermore, TFO Gregory and Trooper Sedgbeer-Williams observed GONZALEZ exit the back door of 738 S. 23rd Street and enter the driver seat of the Odyssey (**subject vehicle**). The Odyssey (**subject vehicle**)

18

ultimately drove to the area of N. 30th Street and W. Burleigh Street, where the warehouse is located (3002 W. Burleigh Street). While in this area, GONZALEZ began to circle the area and randomly pulled over while peering into each vehicle that passed him and was in the area. Case agents recognized this behavior as counter surveillance, which is common with entrenched drug traffickers. To avoid detection and compromising the investigation, case agents cancelled the surveillance operation

51. I believe that tracking the location of the **subject vehicle** will aid case agents in identifying GONZALEZ's drug customers, drug sources of supply, and locations where GONZALEZ stores and/or distributes and/or obtains controlled substances.

52. In order to track the movement of the **subject vehicle** effectively and to decrease the chance of detection, I seek to place a tracking device in or on the **subject vehicle** while it is in the Eastern District of Wisconsin. Because Miguel A. GONZALEZ sometimes parks the **subject vehicle** on the rear lawn of 738 S. 23rd Street and on other private property, it may be necessary to enter onto private property and/or move the **subject vehicle** in order to effect the installation, repair, replacement, and removal of the tracking device. I am aware the residence 738 S. 23rd Street is a two-story duplex having yellow siding with white trim and located on the east side of S. 23rd Street in between W. National Avenue and W. Pierce Street. This is a residential area with numerous neighboring buildings, making the risk of detection significant if law enforcement attempted to install the tracking device during daytime hours. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation and removal of the tracking device during both daytime and nighttime hours.

19

## AUTHORIZATION REQUEST

53.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 authorizing periodic monitoring of the tracking device during both daytime and nighttime hours for a period of 45 days following installation of the device. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance

54.     It is further requested that in the event that the **subject vehicle** travels outside the territorial jurisdiction of the court, the order authorize the continued monitoring of the electronic tracking device in any jurisdiction within the United States, pursuant to 18 U.S.C. § 3117.

55.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the owner or user of the **subject vehicle** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

20

CLERK'S OFFICE
A TRUE COPY
Dec 04, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
_____ District of _____

| | |
|---|---|
| In the Matter of the Tracking of<br>*(Identify the person, property, or object to be tracked )* | )<br>)<br>)<br>)<br>)<br>) |

Case No.    25    MJ    200

## TRACKING WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government shows there is reason to believe that the person, property, or object described above has been involved in and likely will continue to be involved in the criminal activity identified in the application, and ☐ is located in this district; ☐ is not now located in this district, but will be at execution; ☐ the activity in this district relates to domestic or international terrorism; ☐ other:

_____ .

I find that the affidavit(s), and any recorded testimony, establish probable cause to believe that *(check the appropriate box)* ☐ using the object      ☐ installing and using a tracking device to monitor the location of the person, property, or object will satisfy the purpose set out in Fed. R. Crim. P. 41(c) for issuing a warrant.

☐ I find entry into the following vehicle or onto the following private property to be necessary without approval or knowledge of the owner, custodian, or user of the vehicle or property for installing, maintaining, and removing the tracking device:

**YOU ARE COMMANDED** to execute this warrant and begin use of the object or complete any installation authorized by the warrant by ___12/14/2025___ *(no later than 10 days from the date this warrant was issued)* and may continue to use the device until ___01/18/2026___ *(no later than 45 days from the date this warrant was issued).* The tracking may occur within this district or another district. To install, maintain, or remove the device, you may enter *(check boxes as appropriate)*

☑ into the vehicle described above      ☐ onto the private property described above
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Within 10 calendar days after the use of the tracking device has ended, the officer executing this warrant must both return it to *(United States Magistrate Judge)* _____ and — unless delayed notice is authorized below — serve a copy of the warrant on the person who, or whose property or object, was tracked.

☐ Pursuant to 18 U.S.C. § 3103a(b)(1), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and this warrant prohibits the seizure of any tangible property or any wire or electronic communications (as defined in 18 U.S.C § 2510). I therefore authorize the officer executing this warrant to delay notice to the person who, or whose property or object, will be tracked *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    12/04/2025 at 12:15 p.m.        *William E. Duffin*
                                                   *Judge's signature*

City and state: _____      _____
                                                         *Printed name and title*

Case No.

Return of Tracking Warrant With Installation

1.  Date and time tracking device installed: _____

2.  Dates and times tracking device maintained: _____

3.  Date and time tracking device removed: _____

4.  The tracking device was used from *(date and time)*: _____

    to *(date and time)*: _____ .

Return of Tracking Warrant Without Installation

1.  Date warrant executed: _____

2.  The tracking information was obtained from *(date and time)*: _____

    to *(date and time)*: _____ .

Certification

I declare under the penalty of perjury that this return is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*